UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TYRONE HUGHES | * | CIVIL ACTION NO. 20-2374 |
| | * | |
| VERSUS | * | SECTION: "G"(1) |
| | * | |
| KILOLO KIJAKAZI, COMMISSIONER | * | JUDGE NANNETTE JOLIVETTE BROWN |
| OF THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| *********************************** | * | |

REPORT AND RECOMMENDATION

The plaintiff, Tyrone Hughes, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. § 423. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 20) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 21) be GRANTED.

## Procedural Background

Mr. Hughes applied for DIB on March 29, 2016, asserting a disability onset date of August 10, 2013. He alleged the following illnesses, injuries, or conditions: neck, shoulders, back, elbows, wrists, hands, hips, legs, ankles, feet. On October 27, 2016, his claim was denied by the state agency.

Mr. Hughes requested a hearing before an Administrative Law Judge ("ALJ"), which was held on February 6, 2019. At that time, he amended his disability onset date to January 1, 2017. On March 27, 2019, the ALJ issued an adverse decision. Mr. Hughes timely appealed to the Appeals Council, which denied review on July 16, 2020.

1

On August 28, 2020, Mr. Hughes filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 17, 18). The parties filed cross-motions for summary judgment. (Rec. Docs. 20, 21). Mr. Hughes is represented by counsel.

### Evidence in the Record

*Testimony at the Hearing*

A hearing was conducted before the ALJ on February 6, 2019. Mr. Hughes was present with non-attorney representative Gary A. Sells.

Mr. Hughes testified that he has a college education and a master's degree. R. at 4. He described his past work as a teacher and coach. R. at 6. He taught physical education and coached football[1] and track. R. at 6-7. In more recent years, he coached without teaching and only earned a stipend, not a salary. R. at 11.  In 2008, he worked as a FEMA inspector. R. at 7. He would go out and drive down to Plaquemines Parish and inspect the FEMA trailers that people were living in. Id.  In 2011, he began his own consulting company and worked as a minority liaison for a large construction company. R. at 7-8. He would go out and find possible local minority contractors for a big contract to do levee work. R. at 8.

The ALJ asked why his business tapered off, and Mr. Hughes explained that he "just couldn't really go out, the driving, the trying to find people to meetings, it just kind of got tiresome and hectic, and I just couldn't get it done anymore." R. at 9-10.  He also worked as an insurance adjuster for a short period in 2017, but the work required him to climb on top of roofs and perform assessments and his knees could not take it. R. at 10.

---

[1] Mr. Hughes played professional football with the NFL prior to the relevant period.

Mr. Hughes lived by himself until about four months prior to the hearing when a friend who had been put out of her house moved in as a roommate. R. at 11. He mostly hangs out around his house. R. at 11. He watches TV and gets on his computer to look at emails and get on Facebook. R. at 11-12. He sometimes goes out to visit his mother because she lives by herself. R. at 12. Sometimes he drives to get something to eat. Id.  He noted that when he wakes up he has to walk around for about five minutes to get his feet activated. R. at 11-12.

Mr. Hughes is not involved in any social activities. R. at 12. He used to play golf but plays less now because he has to take four Advil before he plays and another four after. Id.

Mr. Hughes has been treating with a psychiatrist who diagnosed him with depression. R. at 13. He has also been seeing a clinical social worker once every two weeks for the preceding two years through an NFL program. R. at 13-14. He explained that because of all the physical pain, he has become withdrawn and does not want to be around people much anymore. R. at 14. With regard to his diagnosis of mild neurocognitive disorder, he explained that he took neurological tests through the concussion case with the NFL. R. at 14. They determined that he had some neurological or cognitive memory loss and signs of a stroke, although he is not aware of ever having suffered a stroke. R. at 14-15.

Mr. Hughes explained that the neurocognitive disorder makes it difficult to remember things. R. at 15. He has to write them down or put them on his calendar so he does not forget. Id. For example, he forgot about his daughter's birthday last year. Id. The biggest issue, he explained, is that he has to make a conscious effort to make sure he leaves the house with everything he needs. R. at 15-16. He said that in the last five or six months he always has to get back out of the car and get something from the house. R. at 16. He also testified that his neurocognitive disorder makes it difficult to focus on things for a long period of time. R. at 16. He did get a master's degree in

juvenile criminal justice in 2016 with scholarship money he received from the NFL, but he had a tutor to help. Id.  He has not used the degree because he would have to go deal with and do programs to help kids figure out what their problems are and that is a problem for him. R. at 16-17.

Next Mr. Hughes described his physical problems. R. at 17. He has constant neck pain and cannot turn his neck too fast, too much, or too often because he gets a sharp pain. Id.  One of his shoulders has a torn labrum and a torn rotator cuff. R. at 17. He has trouble lifting heavy objects and trying to put on a T-shirt. R. at 17-18. His doctors have recommended surgery to repair the torn rotator cuff and the labrum on both shoulders at the same time. R. at 18. But the rehabilitation period is six to seven months and Mr. Hughes prefers to do them one at a time. Id.  He also has arthritis in his elbows, for which he receives laser treatments twice a week. R. at 19. But his workers' compensation only authorizes 26 visits, so they break it up and there are a couple of months that he goes without treatment. Id.  He has torn ligaments in his fingers. Id.  He has arthritis in his lower back that requires shots. Id.  However, workers' compensation does not pay for those so he has not been able to get them. Id. He has an impingement in his right hip that hurts if he turns a certain way or moves. Id.  He has a grinding in his knees. Id. He had surgery on the left knee in 1997 and a bursa sac removed from his left knee, but he believed he needed surgery for both again to have them cleaned out. Id.  He has neuropathy in both legs, which means his feet get numb if he stands too long or tries to run too long. Id.  Numbness happens after about 15-20 minutes of standing or five minutes of running. R. at 20. He has a torn Achilles that flares up every once in a while. Id.

With regard to functional limitations, Mr. Hughes testified that if he stands too long his feet get numb but his back bothers him if he sits down. R. at 21. His shoulders or elbows would

hurt with repetitive lifting. Id.  He believes he could probably lift five pounds, depending on how he is lifting. Id.  He cannot grip too tight because of the torn ligaments in his fingers, and his wrists pop in and out from time to time. R. at 22.

Vocational expert Patricia Ehlinger testified. R. at 22. The ALJ asked her to identify if her testimony varied from information in the Dictionary of Occupational Titles. R. at 22. After classifying Mr. Hughes' past work, she considered the hypotheticals posed by the ALJ. R. at 23. She testified that a person of similar age, education, and past work as Mr. Hughes that was limited to sedentary work with only occasional overhead lifting; only simple, routine, repetitive tasks; occasional public contact or public interaction; and only a routine work setting with routine work changes, would not be able to perform Hughes' past work but would be able to perform work as a general clerk, DOT 209.567-014, SVP 2, with 98,000 jobs available in the United States; a surveillance system monitor, DOT 379.367-010, SVP 2, with 80,000 jobs available in the United States; and an information clerk, DOT 237.367-046, SVP 2, with 90,000 jobs available in the United States. R. at 24. If that person would be off-task for up to 20 percent of the workday because of pain or psychological, neurocognitive disorders, all jobs would be eliminated. Id.  Mr. Hughes' representative did not ask the vocational expert any questions. Id.

*Medical Records*

Mr. Hughes treated with the LSU Health Healthcare Network – St. Charles Clinic from 2013 through 2014. R. at 294-305. In October 2013 he complained of left hip pain, off and on, that was aggravated by going up and down stairs. R. at 302-03. He had full range of motion. Id. Stretching was recommended. Id.  At his January 15, 2014, follow up appointment he had a new complaint of bilateral foot numbness aggravated by exercise. R. at 300. He reported that he had recently returned to regular exercise after not doing so for seven to eight years. Id.  He had full

range of motion, his feet were non-tender, and he had no swelling. Id.  Stretching exercises were recommended and he was referred for evaluation for possible neuropathy. Id.  On May 12, 2014, he complained of right posterior ankle pain and shoulder pain since 2004. R. at 296-97. He had full range of motion in the ankle, was diagnosed with a right Achilles tendon strain, and was prescribed a boot and an NSAID to be taken as needed. Id.  His shoulder had full flexion, full internal and external rotation, and 120 abduction with pain on extremes of abduction and internal rotation. Id.  He was diagnosed with left shoulder rotator cuff tendonitis and prescribed tramadol to be taken as needed. Id.  He followed up on July 23, 2014 and reported his left shoulder symptoms had increased. R. at 294. It was noted that an MRI from June 2014 revealed shoulder impingement with partial rotator cuff tear and fraying of biceps anchor and glenoid labrum. Id.  An injection was administered. Id.

Mr. Hughes treated at the West Jefferson Heart Clinic of Louisiana from 2013 through 2017 for mild diffuse carotid disease, high cholesterol, hypertension, and borderline blood sugars. R. at 324-71. At times a vitamin D deficiency and sleep apnea were also noted. Id. In April 2013, Mr. Hughes reported numbness and tingling in his legs with ambulation, especially running. R. at 365. Possible neuropathy was noted again in August 2013 and November 2013, and Mr. Hughes was referred to Dr. Michael Puente. R. at 358, 361. In June 2016, Mr. Hughes was negative for early coronary disease and positive for diabetes. R. at 340. In August 2016, he reported that he had developed some epigastric discomfort a week earlier. R. at 335.

Mr. Hughes treated with New Orleans Nephrology Associates, LLC, in 2015 and 2016. R. at 566-70, 306-08. He was diagnosed with renal dysfunction secondary to chronic use of NSAIDs and it was recommended that he discontinue NSAIDs. R. at 568. A renal ultrasound showed his

kidneys were normal in size and appearance. R. at 570. In April 2016, it was noted that his condition was improving. R. at 308.

Mr. Hughes treated with Endocrinology and Diabetes Associates for hyperglycemia in 2016 and 2017. R. at 377-391. The records consistently reflect a stable gait, normal station, and normal mood and affect. The records note that Ms. Hughes suffers from NSAID induced renal dysfunction that prevented the use of metformin for his hyperglycemia. He was prescribed Victoza and later Onglyza. In January 2016 and May 2017, he denied anxiety, back pain, depression, and numbness. R. at 378, 390.  In January 2017, he reported those same symptoms. R. at 384.

Mr. Hughes underwent examination and treatment at the Tulane Medical Center in 2017 and 2018. On January 13, 2017, he presented to Dr. Gregory Stewart with complaints of bilateral shoulder pain. R. at 472. He reported difficulty doing all routine activities of daily living. Id.  He had no numbness, tingling, or radiating. Id.  On examination, he was in no acute distress and had fair motion of both shoulders, pain with overhead activity, pain with resisted external rotation, and equivocal O'Brien's test bilaterally. R. at 474. An MRI of the hip was performed on February 16, 2017 and revealed anterior to anterior superior left acetabular labral fraying; mild to moderate bilateral degeneration of the femoral acetabular joints; and mild bilateral trochanteric bursitis. R. at 475. An MRI of the lumbar spine was also performed and revealed mild L5-S1 disc degeneration but was otherwise unremarkable. R. at 465.

Mr. Hughes followed up with Dr. Stewart on March 8, 2017, with complaints of increasing cervical and lumbar spine pain as well as right knee pain. R. at 468. He described the neck pain as increasing, intermittent pain that radiates in the shoulder and arms with occasional numbness and tingling. Id.  But he reported no such symptoms on the date of examination. Id.  He also reported increasing discomfort in the lumbar spine with occasional pain radiating down to the right hip and

knee. Id.  He reported that occasionally he has pre-existing knee pain that had been worsened by a recent long car trip. Id. On examination he had fair motion of his cervical and lumbar spines and upper and lower extremities. R. at 470. His motor strength was 5/5 and equal bilaterally. Id.  MRIs of the cervical and lumbar spine were ordered. Id.

On March 27, 2017, Mr. Hughes followed up with Dr. Michael O'Brien with complaints of shoulder pain. R. at 425. Pain at night was his biggest complaint; he also reported occasional pain during the day with lifting and overhead activities. Id.  The following treatment options were discussed: living with it, cortisone injections, home exercises, physical therapy for strengthening, or surgery. R. at 427. Home exercises were continued for the time being. Id.

Mr. Hughes followed up with Dr. Stewart on May 24, 2018, and complained of increasing cervical spine, lumbar spine, and knee pain. R. at 446. The details of his complaints of pain were identical to those at his March 2017 visit. Id.  He was under no acute distress and had fair motion of his cervical and lumbar spine and extremities. R. at 448.  He had motor strength of 5/5 bilaterally. Id. His medication list included Norco 5-325 every 12 hours. R. at 446.

Mr. Hughes followed up for shoulder pain with Dr. O'Brien on August 8, 2018. R. at 429. He reported that his pain had worsened and that he was taking Tylenol because he was not supposed to take ibuprofen due to kidney issues. Id.  Surgery was offered for shoulder arthroscopy with rotator cuff repair, subacromial decompression, and distal clavicle rehab. R. at 430. It was noted that Mr. Hughes was contemplating surgery in January 2019. Id.

Mr. Hughes was also evaluated by Dr. Jacques Courseault on August 8, 2018, in conjunction with the NFLPA Trust Milestone Wellness Assessment program. R. at 431. His primary concerns were low back pain and lateral hip pain. Id.  On examination, Mr. Hughes had significant tenderness to palpation at posterior iliac crest bilaterally that reproduced symptoms

including mild referred pain into each leg and tenderness to palpation of the bilateral gluteus maximus and bilateral greater trochanters. Id.  He had a negative straight leg raise. Id.  Dr. Courseault noted that the x-rays did not show any bony abnormalities. Id.  Mr. Hughes' hips were tender to palpation at both greater trochanters and along iliotibial bands. Id.  Dr. Courseault noted that the x-rays were consistent with mild to moderate osteoarthritis and likely femoral acetabular impingement. Id. For back pain, Dr. Courseault recommended that prolotherapy would be the best option for treatment with physical therapy and weight loss discussed; for hip pain, Dr. Courseault recommended physical therapy and possibly intra-articular hip injections. Id.  Because symptoms were intermittent, he suggested physical therapy first. Id.

Mr. Hughes also followed up with Dr. Stewart on August 8, 2018, for evaluation through the NFLPA Trust Milestone Wellness Assessment program. R. at 418. His reports of pain were identical to his March 2017 and May 2018 visits. Id.  On examination he had motor strength of 5/5 and equal bilaterally. R. at 419.

Mr. Hughes also treated for depression with Dr. Angela Traylor at the Tulane Medical Center from at least November 2017 through August 2018.  On November 1, 2017, Mr. Hughes complained of depressed mood, insomnia, irritability, and impairment in social functioning. R. at 456. He reported that his family complains he is too aggressive with his daughter. Id.  He reported that he feels a little less irritable while taking Lexapro. Id.  On examination, his concentration and insight was fair and his intelligence, fund of knowledge, judgment, and impulse control were normal. R. at 457-58. His mood was not good. Id.

He followed up with Dr. Traylor on May 29, 2018. R. at 443. He complained of depressed mood, concentration difficulties, and impairment in social functioning. Id.  He reported feeling a little less irritable while taking Lexapro and denied side effects. Id.  His sleep was more consistent

with the use of a CPAP machine. Id.  On examination his thought process had an overabundance of ideas; he was able to demonstrate simple abstraction; he had average intelligence, fund of knowledge, judgment,  and impulse control; and his insight was fair. Id.  His mood was "ok." Id.

Dr. Traylor performed a full evaluation on July 3, 2018. R. at 439-40. On examination, Mr. Hughes' general knowledge and judgment were within normal variation and his recent and long term memory were intact. R. at 440. He had motor strength of 5/5 and his gait was within normal limits. Id.

Dr. Traylor evaluated Mr. Hughes on August 8, 2018. R. at 436. Mr. Hughes reported feeling depressed, being socially isolative, and being argumentative. Id.  He also reported tolerating people better on his current medication. Id.  His mood was "ok;' he had appropriate, somewhat dysthymic, affect and an overabundance of ideas. R. at 437. His intelligence, fund of knowledge, judgment, impulse control were average and his insight was fair. Id.  He was ordered to continue Lexapro. Id.

*Medical Opinions*

Kenneth L. Nudleman, M.D., produced a report dated October 27, 2009, diagnosing Mr. Hughes with post-traumatic headaches, disorder of sleep, and arousal with joint acropathies. R. at 507-10. Dr. Nudleman opined that Mr. Hughes' post-traumatic head syndrome was intermittent and half-way between minimal and slight and that his disorder of sleep and arousal was frequent and halfway between minimal and slight. Id. at 509.  He opined that it was more likely than not that Mr. Hughes was "permanent and stationary"[2] and that he had become permanent and

---

[2] Under California's Workers' Compensation regulations, "'Permanent and stationary status' is the point when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment." Cal. Code Regs. tit. 8, § 9785(a)(8). Both Dr. Nudleman and Dr. Leynes were operating in California at the time of their reports.

stationary one year after completing his professional football career. He also opined that Mr. Hughes should not work in an environment that would subject him to constant multi-tasking or where there was a potential for head injury. Id.  It appears that the evaluation was done in conjunction with Mr. Hughes' workers' compensation claim because Dr. Nudleman also opined that 100% of Mr. Hughes impairment was industry related. Id.  Dr. Nudleman's opinions were based on Mr. Hughes' clinical presentation, history, and evaluation, but no neurodiagnostic studies were performed. Id.

Dr. Nudleman revisited his earlier findings in a May 18, 2017, report in which he reviewed additional records and concluded that as to impairment ratings, causation, and apportionment, his opinions remained the same. R. at 505. Dr. Nudleman issued a subsequent report dated April 8, 2018. R. at 498-501. The report includes a section summarizing medical records and another section titled "comment," which appears to summarize Dr. Nudleman's August 17, 2017, deposition testimony. R. 500. According to this summary, Dr. Nudleman was asked regarding the symptoms of posttraumatic head syndrome and he noted "short-term memory problems, recall, long-term memory, difficulty focusing, executive functions, and multitasking and he may have anxiety, depression, and some forms of sleep disorder with initiating and maintaining sleep. Others may have dizziness and lightheadedness." Id.  It does not appear that the April 2018 report contains any new opinions regarding Mr. Hughes' condition or ability to function.

Maria Ruby Leynes, M.D., issued a report on December 8, 2009, diagnosing Mr. Hughes with gastritis, labile hypertension by history, abnormal electrocardiogram r/o cardiac disease, history of chronic use of nonsteroidal anti-inflammatory medication, orthopedic diagnoses, and elevated serum glucose. R. at 541. She summarized Mr. Hughes' report of his history, her physical examination of Mr. Hughes, and Mr. Hughes' medical records. R. at 529-39. She concluded that

it was medically reasonably probable that Mr. Hughes' "gastrointestinal symptoms have been substantially aggravated by chronic stress of orthopedic injuries and the medication to relief the pain of those injuries." R. at 543. Although Mr. Hughes reported relief with occasional use of ranitidine, Dr. Leynes recommended regular use of a proton pump. Id. Dr. Leynes opined that Mr. Hughes "may be considered permanent and stationary from an internal medicine standpoint for rating purposes." Id. In the "Work Restriction" section of the report, she opined that because of his gastrointestinal disability, Mr. Hughes "should be precluded from further exposures to more than usual levels of emotional stress as such exposure will almost certainly compound this medical problem." Id. It appears Dr. Leynes' report was issued in conjunction with Mr. Hughes' workers' compensation claim because she opined that 50% of his gastrointestinal impairment was a result of his industrial related orthopedic injuries and 50% was apportioned to non-industrial causation. R. at 545. She recommended future medical care for his gastrointestinal symptoms, the presence of helicobacter pylori antibodies in his blood, his hypertension, his EKG findings, and the elevated glucose, creatinine, cholesterol, uric acid, bilirubin, and urobilinogen findings in blood samples and urinalysis. Id.

Dr. Leynes supplemented her report on December 24, 2009, in response to questions from Mr. Hughes' attorney about whether Mr. Hughes' abnormal EKG was industrially related. R at 527. Dr. Leynes opined that because of the stress due to pain, increased weight gain likely due to inactivity because of his orthopedic condition, and his history of elevated blood pressure, which were all directly related to his career as a professional football player, the cardiology consultation recommended in her previous report should be provided on an industrial basis. Id.

Dr. Leynes issued another report on October 21, 2010. R. at 522. She summarized medical records she had reviewed. R. at 522-23. She recommended Mr. Hughes undergo a cardiology

consultation for elevated cholesterol, participate in a weight loss program, and see a pulmonologist for a possible CPAP machine. R. at 524-25. Dr. Leynes also affirmed her prior finding of gastritis and apportioned 50% to non-industrial factors. R. at 525.

Dr. Leynes issued another report on May 5, 2017, after a reevaluation examination of Mr. Hughes and a review of his medical records. R. at 512. She listed the following diagnoses: gastritis, labile blood pressure, no cardiac dysfunction per history, carotid artery disease per history, renal insufficiency, prediabetes, increased lipids, sleep apnea, psyche diagnoses, orthopedic diagnoses. R. at 518. The report appears to be merely a summary of the medical records reviewed with some treatment recommendations such as that Mr. Hughes should be provided with a non-gastric irritating medication for pain such as tramadol as needed, his blood pressure should continue to be monitored as noted in her initial report, he should be provided with a medically supervised weight loss program, and a CPAP machine for sleep apnea should be provided on an industrial basis. R. at 520-21. No opinions regarding Mr. Hughes' functional limitations or necessary work restrictions were provided.

Neal Deutch, Ph.D., of Associates in Neuropsychology performed an evaluation on October 12, 2017, and concluded that Mr. Hughes meets the criteria for mild neurocognitive impairment. R. at 395-403. Mr. Hughes reported that his problems include forgetting appointments with peers, trouble initiating and completing tasks, issues with immediate memory such that he must write down plans and appointments immediately, decreased attention and concentration, taking longer to do things, periods of disorientation, feeling irritable and short tempered, mood swings, being argumentative, being more reclusive, recurrent headaches, problems with vision and hearing, numbness and tingling, frequent pain, and fatigue. R. at 395. He denied cognitive problems impacting ability to work. R. at 396. He reported a history of concussions while playing

football. Id.  He reported being frustrated due to physical complaints. R. at 398. His thought process was logical and goal directed and he did not evidence overt neurobehavioral symptoms such as cognitive impairment, aggression, or emotional lability. Id. He also reported symptoms consistent with depression and anxiety. Id. He had premorbid functioning in average range, a full scale IQ and general ability in  the low average range, verbal comprehension in the average range, and perceptual reasoning in the low average range. Id.  He had poor performance on tasks where perceptual performance was impacted by poor processing speed. Id.  He had mild to moderate impairment in information processing. Id.  His working memory was in the average range. Id. Short delay and long delay recall was also in the average range. Id.

Licensed Clinical Social Worker ("LCSW") Tammy Bayard issued a letter dated January 30, 2019, reporting that she had treated Mr. Hughes from June 30, 2016 through October 24, 2018. R. at 599. She noted a diagnosis of persistent depression disorder and noted that Mr. Hughes reported a depressed mood most of the day. Id.  She described symptoms of depressed and anxious mood, lack of motivation, feelings of hopelessness, social withdrawal, low energy, poor concentration, difficulty making decisions, and anxiety around large groups that affected him attending certain social situations. Id.  She added that chronic pain from physical health issues affect Mr. Hughes' mood and physical and social functioning. Id.  She noted that at times, there was some decrease in his depression but the symptoms never fully resolved. Id.  Mr. Hughes became better at making decisions, his anxiety became more controlled at times, and he experienced more ease in social situations. Id.  She noted he was extremely frustrated with his financial situation and that struggles with workmen's compensation had resulted in some issues with continuing care. Id.  She also noted that at his last appointment, he was still struggling with

some symptoms of depression and anxiety. Id.  She did not opine as to any recommended work restrictions.

Jason Gunter, PhD reviewed Mr. Hughes' medical records and opined as to his mental residual functional capacity for the state agency on October 26, 2016. R. at 74-76. He opined that Mr. Hughes had moderately limited ability to remember, understand, and carry out detailed instructions; moderately limited attention and concentration for extended periods; moderately limited ability to interact with the general public; and no other social interaction limitations. R. at 74-76. He also opined that Mr. Hughes is able to perform simple and more complex tasks of 1-4 steps with routine supervision, able to interact appropriately with coworkers and supervisors, able to interact appropriately for occasional public contact, and able to adapt to a work setting and some changes in work settings. R. at 76.

Dr. Robert Evans reviewed Mr. Hughes' medical records and opined as to his physical residual functional capacity for the state agency on October 27, 2016. R. at 72-74. He limited Mr. Hughes to lifting 20 pounds occasionally and 10 pounds frequently; sitting, standing, and walking for a total of 6 hours per day; limited pushing and pulling with the left upper extremity; and limited reaching overhead bilaterally. R. at 72-73.

*Post Hearing Opinion Evidence:*[3]

Dr. Steven T. Atkins with Culicchia Neurological Clinic produced a report dated June 17, 2019. R. at 27-28. Dr. Atkins examined Mr. Hughes under the NFL's Baseline Assessment Program. Id.  Mr. Hughes reported his experience with concussions while playing professional football and before. Id.  He reported that he had been told he has memory problems. Id.  A physical examination was performed and neurocognitive testing was reviewed. Id.  He noted an impression

---

[3] The Appeals Council did not consider the assessment of Dr. Atkins or the statement of Ms. Roach because it found that "this evidence does not show a reasonable probability that it would change the outcome of the decision." R. at 34.

of concussion, encephalopathy, and headache with a cognitive impairment level of 1.5.[4] Id. Dr. Atkins recommended Mr. Hughes get neurological follow-up and noted that Mr. Hughes would likely need a follow-up MRI and that a PET scan of the brain should be considered. Id.

Clinical Social Worker Sherlena Roach filled out a form labeled NFL Concussion Settlement, Third Party Sworn Statement: Functional Impairment on August 17, 2019. R. at 29. She reported "working/providing personal services for Mr. Hughes" over the past decade.[5] R. at 31. She listed examples of issues she had noticed over the past years, including decreased attention and concentration, poor decision making, and poor problem solving. Id. She noted that he had been "dependent on others for basic needs, limiting his ability to obtain independent living skills." Id.

### Decision of the Administrative Law Judge

Of relevance to the present appeal, the ALJ determined that Mr. Hughes last met the insured status requirements of the Act on September 30, 2018.  The ALJ found that through Mr. Hughes' date last insured, he had the following severe impairments:  mild neurocognitive disorder, depression, degenerative disc disease, osteoarthritis, and obesity. But the ALJ found that through the date last insured, Mr. Hughes did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ next assessed Mr. Hughes' residual functional capacity ("RFC") in consideration of the entire record. The ALJ found that through the date last insured, Mr. Hughes had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except he is limited to occasional

---

[4] The cognitive impairment finding was based on neurocognitive testing dated January 23, 2019.
[5] Of note, Ms. Roach does not explicitly state that she treated or provided counseling services to Mr. Hughes. When asked about his mental health issues at the hearing, Mr. Hughes reported treating with a psychiatrist at Tulane Medical Center and seeing clinical social worker Bayard. He did not mention receiving counseling from Ms. Roach.

overhead reaching; simple, routine, repetitive tasks; occasional public interaction; and routine work changes.

The ALJ determined that Mr. Hughes was unable to perform any past relevant work. The ALJ found that on the date last insured, Mr. Hughes was 48 years old, which is defined as a "younger individual" for purposes of assessing Mr. Hughes' ability to adjust to other work. [6] The ALJ also found that Mr. Hughes has at least a high school education and is able to communicate in English. The ALJ determined that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports the finding that Hughes is "not disabled" whether or not he has transferable job skills.

The ALJ next determined that considering Mr. Hughes' age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Mr. Hughes could perform. In coming to this conclusion, the ALJ relied on the testimony of the vocational expert. She testified that an individual with Mr. Hughes' age, education, work experience, and RFC would have been able to perform the requirements of representative occupations such as General Clerk, Surveillance System Monitor, and Information Clerk. The ALJ determined that the vocational expert's testimony was consistent with the information in the Dictionary of Occupational Titles.

Finally, the ALJ concluded that Mr. Hughes was not under a disability as defined in the Act at any time from the amended alleged onset date of January 1, 2017, through September 30, 2018, the date last insured.

---

[6] The ALJ's opinion states that he was a "younger individual age 18-44." But that is a typographical error because the Act defines "younger" individual as someone 18-49. 20 C.F.R. § 404.1563 ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work.").

### Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ erred in evaluating the medical opinion evidence.

Issue No. 2.    Whether there is an unresolved conflict between the vocational expert's testimony and the Dictionary of Occupational Titles that requires reversal of the ALJ's decision.

Issue No. 3    Whether the appointment of Andrew Saul as a single commissioner of the SSA removable only for cause and for a longer term than the president violates separation of powers and therefore results in a constitutionally defective decision by the ALJ and Appeals Council judges requiring a remand.

### Analysis

## I.    Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).

Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

**III.**    __Plaintiff's Appeal__.

***Issue No. 1.    Whether the ALJ erred in evaluating the medical opinion evidence.***

a.  *Parties' Arguments*

Mr. Hughes argues that remand is required because the ALJ failed to consider the December 2009 and October 2010 opinions of Dr. Leynes, the October 2009 and May 2017 opinions of Dr. Nudleman, and the January 2019 opinion of LCSW Bayard. He further argues that remand is appropriate because the ALJ failed to consider the August 2019 opinion of C.S.W. Roach, which was submitted to the Appeals Council after the ALJ rendered his decision. Mr. Hughes argues that the ALJ's failure to consider opinion evidence of record was an absolute legal error.

The Commissioner responds that the ALJ did not err in failing to consider the December 2009 opinion of Dr. Leynes and the October 2009 opinion of Dr. Nudleman because these opinions were rendered eight years before Mr. Hughes' alleged disability onset date. Further, the ALJ argues that even had these opinions been considered, they would not have affected the outcome of the ALJ's decision because they cannot overcome the ALJ's findings that Mr. Hughes was not disabled during the relevant period. The Commissioner further argues that the May 2017 letter by Dr. Nudleman and the January 2019 letter by Ms. Bayard do not contain medical opinions. Further, the Commissioner points out that the ALJ discussed Ms. Bayard's January 2019 letter. The Commissioner does not address the Appeals Council's consideration of Ms. Roach's August 2019 letter. Nor does the Commissioner explicitly address the October 2010 opinion of Dr. Leynes.

b.  *Law and Analysis*

The regulations require that the Commissioner consider all evidence in the case record when making a disability determination. 20 C.F.R. § 404.1520(a)(3). Further, the Commissioner must evaluate every medical opinion received. Id.  at § 404.1527 (c).[7] Unless giving controlling weight to the opinion, the Commissioner must consider the following factors in deciding the weight to give the opinion: examining relationship, treatment relationship, supportability, consistency, and specialization. Id.; Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000) ("[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).").

"Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). A physician's opinion that a person is disabled or other opinions on issues reserved to the commissioner are not "medical opinions" that require deference, and the Commissioner does not give any special significance to such opinions. Id.  at § 404.1527(d).

The Commissioner takes the position that while evidence prior to the disability onset date can be considered, the ALJ is not required to do so. This interpretation appears to be contrary to the instructions of the regulations cited above, which specifically require her to *consider all evidence in the case record*, 20 C.F.R. § 404.1520(a)(3), and evaluate *every medical opinion*

---

[7] Because Mr. Hughes' application was filed before March 27, 2017, the current regulation regarding medical opinions is not applicable. See 20 C.F.R. § 404.1527; § 404.614.

*received*. Id.  § 404.1527(c). While the cases cited by the Commissioner recognize that she may consider evidence from before the alleged disability onset date, the issue before those courts was entirely different from the one before this court. In one of the cited cases, the ALJ had summarized and discounted an opinion submitted during a prior disability benefits application that had been denied. Frustaglia v. Sec'y of Health & Hum. Servs., 829 F.2d 192, 193 (1st Cir. 1987). The court noted that "the ALJ is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled at the time of his second application." Id.  The court found that the ALJ's assessment of the earlier opinion was not a reappraisal, but merely a recitation of background information. Id. Here, there is no issue as to whether the ALJ improperly reopened a prior disability application by reconsidering prior evidence. In the other case cited by the Commissioner, the court rejected the claimant's argument that the ALJ improperly relied on a 2008 psychological evaluation because it predated his March 2010 disability onset date. Williams v. Colvin, 575 F. App'x 350, 354 (5th Cir. 2014). The court found the pre-onset date evaluation was particularly relevant because it pertained to the same claimed disability for which the claimant sought benefits, because there was substantial evidence to support giving less weight to the 2010 examination, and because the 2010 evaluation was inconsistent with the 2008 findings. Id.  Here, Mr. Hughes makes the opposite argument—he does not claim the ALJ improperly considered pre-onset evidence but that the ALJ improperly failed to do so. Moreover, the Williams case quoted Hamlin v. Barnhart, where the Tenth Circuit Court of Appeals held that the ALJ erred in failing to consider certain medical opinions of the claimant's treating physicians, including opinions dated before the disability onset date. 365 F.3d 1208, 1215-19. Contrary to establishing that the ALJ's consideration of  pre-disability onset date evidence is optional, Hamlin appears to require it. See id.; see also

Carpenter v. Astrue, 537 F.3d 1264, 1266 (10th Cir. 2008) (holding that the ALJ erred in failing to consider evidence before the alleged disability onset date because the ALJ is required to consider all evidence in the record and must discuss the significantly probative evidence that the ALJ rejects).

A district court in Texas recently determined that "the Fifth Circuit has not specifically addressed whether ALJs are required to consider medical opinions that predate the alleged onset of disability," but that other circuits[8] "have found that an ALJ may not simply ignore medical opinions because they pre-date the onset of disability or post-date the last insured date, since that evidence can be relevant to a claim of disability." Davidson v. Colvin, 164 F. Supp. 3d 926, 941 (N.D. Tex. 2015). Indeed, like the Tenth Circuit in Hamlin, it appears the Seventh Circuit has found that the Commissioner errs in failing to consider prior evidence. See Groves v. Apfel, 148 F.3d 809, 810 (7th Cir. 1998).[9] The Davidson court found that the ALJ erred in failing to even mention the pre-onset date opinion of the claimant's treating physician and that even if the ALJ's statement that he had reviewed the record as a whole was sufficient to conclude that the ALJ had in fact considered the opinion, the ALJ also erred because he failed to articulate good cause for assigning little or no weight to the opinion. 164. F. Supp. 3d at 942-43. Further, the court found the error was not harmless because the physician opined that the claimant's conditions would cause periodic absences from work, were very unpredictable, and would require close and frequent treatment by a physician and these opinions were the only ones in the record from a treating or examining physician concerning the claimant's limitations. Id. at 944. The court determined that

---

[8] Some of the cases cited by the Davidson court seem only to support that such evidence is not barred from consideration by res judicata because it may be relevant. E.g., Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); DeBoard v. Comm'r of Soc. Sec., 211 F. App'x 411, 414 (6th Cir. 2006).

[9] Although the circuit court in Groves found the district court erred in failing to consider evidence from an earlier disability proceeding, the court held this "irrelevant" because the appeal would be considered de novo. 148 F.3d at 810.

it was not inconceivable that had the ALJ considered this opinion, he would have reached a different decision. Id.

This court need not decide whether the Commissioner was required to consider the earlier opinion, however, because remand is not appropriate even if the Commissioner erred in not doing so. As alluded to by the Davidson court and as argued by the Commissioner, failure to consider evidence of record only requires reversal where "the substantial rights of a party have been effected." Anderson v. Sullivan, 887 F.2d 630, 634 (5th Cir. 1989) (quoting Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)). "Where the resulting disability determination remains unchanged, even if some of the reasoning underlying that decision is erroneous, no substantial rights have been affected." Qualls v. Astrue, 339 F. App'x 461, 464 (5th Cir. 2009). Remand is required only where the improprieties cast doubt on the existence of substantial evidence to support the ALJ's decision. Id.; Keel v. Saul, 986 F.3d 551, 556 (5th Cir. 2021) (""Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached even if the ALJ did not err."). The purpose of this so-called harmless error rule "is to preserve judgments and avoid waste of time." Mays, 837 F.2d at 1364.

The ALJ here did not mention the December 2009 and October 2010 reports of Dr. Leynes or explain why he failed to do so.[10] Assuming this was an error, the court finds it to be harmless. In the December 2009 report, Dr. Leynes provided diagnoses and recommendations for medical treatment along with an assessment of the extent to which Mr. Hughes' impairments were industrially related. Dr. Leynes opined that Mr. Hughes required work restrictions that would avoid further exposure to more than usual levels of emotional stress because this would compound his

---

[10] The ALJ did state that the decision was rendered "[a]fter careful consideration of the *entire* record." R. at 46 (emphasis added). However, even if this could lead to the conclusion that the ALJ considered and discounted the 2009 and 2010 Leynes reports, the court could not conclude that the ALJ explained the basis for discounting them.

gastrointestinal problems. Later in December 2009, she supplemented her report with regard to the causation of Mr. Hughes' abnormal EKG. In October 2010, Dr. Leynes affirmed her prior finding of gastritis and apportioned 50% to non-industrial factors.

Mr. Hughes has not argued that he required additional limitations because of gastritis. Indeed, he did not mention gastrointestinal issues at the hearing. The only medical record besides the report of Dr. Leynes to mention gastrointestinal issues is an August 11, 2016, West Jefferson Heart Clinic record noting that Mr. Hughes had developed some epigastric discomfort in the preceding week. As the Commissioner points out, Dr. Leynes' reports are from a time period seven to eight years before the alleged disability onset date. There is simply no evidence to support finding that gastritis is a condition that resulted in functional limitations during the relevant period. Moreover, the only opinion Dr. Leynes provided with regard to functional limitations was that Mr. Hughes should not be subjected to more than usual levels of emotional stress. The ALJ's RFC assessment includes limitations that would address this concern: only simple, routine, and repetitive tasks; only occasional public interaction; and only routine work changes. It is inconceivable that consideration of Dr. Leynes' reports (assuming that ALJ did not do so) would have changed the ALJ's decision.

The ALJ also failed to mention the October 2009 and May 2017 reports of Dr. Nudleman or explain why he did not do so. To the extent this was an error, it was harmless.

Dr. Nudleman's October 2009 report diagnosed Mr. Hughes with post-traumatic headaches, disorder of sleep and arousal with joint acropathies. Dr. Nudleman opined that the post-traumatic head syndrome was intermittent and half-way between minimal and slight and that the disorder of sleep and arousal was frequent and halfway between minimal and slight. He opined that Mr. Hughes had reached permanent and stationary status a year after completing his football

career. And he opined that Mr. Hughes should not work in an environment that would subject him to constant multi-tasking or where there was a potential for head injury. In 2017 he affirmed his earlier opinions.

Mr. Hughes does not explain how the opinions of Dr. Nudleman might have changed the ALJ's assessment of his RFC. Dr. Nudleman determined that Mr. Hughes' post-traumatic head syndrome and sleep disorder were halfway between minimal and slight, and he imposed only minimal work restrictions. Importantly, the ALJ included limitations to only simple, routine, and repetitive tasks, which would preclude multi-tasking as recommended by Dr. Nudleman. Although the ALJ did not explicitly include a limitation concerning head injuries, there is no basis to conclude that representative jobs like general clerk, surveillance system monitor, or information clerk would include a risk for head injury: the Dictionary of Occupational Titles and its companion the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles contain no such suggestion.[11]   It is inconceivable that had the ALJ considered Dr. Nudleman's reports that it would have changed the ALJ's disability determination.

Mr. Hughes also challenges the ALJ's consideration of Ms. Bayard's 2019 letter. Contrary to his suggestion that the ALJ "neither mentioned nor evaluated Counselor Bayard's opinion as to Mr. Hughes' functional limitations," the ALJ discussed Ms. Bayard's letter in detail. The ALJ noted the length of the treatment relationship and the diagnosis of persistent depression disorder. The ALJ noted the symptoms Ms. Bayard reported that Mr. Hughes presented with, including those highlighted by Mr. Hughes in his motion –lack of motivation, social withdrawal, poor concentration, difficulty making decisions, and anxiety around large groups of people. The ALJ also noted Ms. Bayard's report that Mr. Hughes complained of chronic pain, that he struggled to

---

[11] See discussion of these texts on pages 33-34, infra.

make changes to the pervasiveness of his personal situation, that his depression symptoms had decreased but were never fully resolved, that he became better at making some decisions and changes, that his anxiety became more controlled at times, and that he had experienced more ease in social situations.

It appears that Mr. Hughes' concern may be that the ALJ did not describe the letter as an opinion, give it controlling weight, or explain why the ALJ was not doing so. Although the letter does not contain any opinions about specific functional limitations, the court finds that Ms. Bayard's letter amounts to a medical opinion because it reflects Ms. Bayard's diagnoses and her judgment about the severity of Mr. Hughes' symptoms. As such, the ALJ erred in failing to consider the letter as an opinion. Once again, however, the court finds this error to be harmless. The ALJ considered the letter in detail and, critically, consistent with Ms. Bayard's diagnosis, the ALJ found Mr. Hughes' depression to be a severe impairment. Further, the ALJ's RFC assessment is consistent with Ms. Bayard's observations that his depression had improved though not fully resolved and that his anxiety had become more controlled. The RFC includes limitations on the complexity of tasks and interaction with the public. Ms. Bayard identified no functional limitation or work restriction. Had the ALJ explicitly given Ms. Bayard's letter conclusive weight, it is inconceivable that the ALJ's disability determination would have differed.

Mr. Hughes' final medical opinion challenge concerns the 2019 report of Ms. Roach, which he submitted to the Appeals Council after the ALJ rendered his opinion. [12] He argues that this report "supported the functional limitations ignored by the ALJ." He points out that Ms. Roach stated that Mr. Hughes had poor decision making, poor problem solving, decreased attention and concentration, and limited ability to obtain independent living skills. Ms. Roach explained the

---

[12] To the extent Mr. Hughes' assignment of error is based on the ALJ's failure to consider the Roach report, there can be no error because the report did not exist at the time the ALJ rendered his opinion.

latter was due to being dependent on others for basic needs. Of note, though, Mr. Hughes' testimony does not reflect that he received any assistance with his basic needs.

Mr. Hughes argues that Ms. Roach's report[13] supports the limitations "described by the medical sources in the record before the ALJ and ignored by the ALJ." But he does not identify the limitations or medical record evidence that Ms. Roach's observations purportedly support. To the extent he invokes the reports of Dr. Nudleman, Dr. Leynes, and Ms. Bayard discussed above, the court has already determined that none of those reports could have supported additional RFC limitations. This remains true even if the observations of Ms. Roach are also considered. If there is some other medical evidence upon which Ms. Hughes bases his assignment of error, the court cannot guess what it may be.

The ALJ's assessment of Mr. Hughes' mental health was based on the neurocognitive evaluation of Dr. Deutch, the letter of his treating counselor Ms. Bayard, and the records of his treating psychiatrist Dr. Traylor. The ALJ recognized that Ms. Bayard's letter notes symptoms of poor concentration and Dr. Deutch's diagnosis of mild neurocognitive impairment. The ALJ included limitations in the RFC such as a limitation to simple, routine, and repetitive tasks. The Appeals Council considered the report of Ms. Roach but concluded that the "evidence does not show a reasonable probability that it would change the outcome of the decision." R. at 34. The court finds no error in the Appeals Council's decision and finds that the Appeals Council's failure

---

[13] It is not entirely clear that Ms. Roach's report amounts to a medical opinion. Ms. Roach used an NFL Concussion Settlement form designed to allow a person who personally knows the retired football player to describe his functional impairment. Family members are excluded from completing the form. Although Ms. Roach indicates she is a clinical social worker, she does not state that she treated or evaluated Mr. Hughes in her capacity as a clinical social worker. Importantly, there is no indication in Mr. Hughes' testimony or the medical records that he treated with or was evaluated by Ms. Roach. She states that she has been "working/providing personal services for Mr. Hughes" over the past ten years and that she has noticed a decline in his cognitive capabilities over that time period.

to reverse or remand the ALJ's decision on account of the Roach report does not compel a remand here.

**Issue No. 2.    *Whether there is an unresolved conflict between the vocational expert's testimony and the Dictionary of Occupational Titles that requires reversal of the ALJ's decision.***

a. *Parties' Arguments*

Mr. Hughes argues that the ALJ erred because there was an apparent conflict in the hypothetical question to the vocational expert and the DOT and the ALJ failed to obtain a reasonable explanation from the expert or resolve the conflict. He submits that while the hypothetical precluded more than occasional reaching, the DOT descriptions for general clerk and information clerk require frequent reaching. He also submits that the hypothetical limiting Mr. Hughes to occasional interaction with the public is inconsistent[14] with the DOT description for telephone quotation clerk, which consists entirely of answering telephone calls from customers. He submits it is also inconsistent with the DOT description for general clerk (food and beverage order clerk) which requires taking food and beverage items over the telephone, suggesting menu items, answering questions regarding food or service, and collecting cash for service. He submits it is also inconsistent with the DOT description for surveillance system monitor, which requires frequent talking and hearing and dealing with people.

---

[14] Mr. Hughes further argues that the ALJ erred in failing to adopt limitations on Mr. Hughes' ability to interact with co-workers or supervisors despite acknowledging that he was "socially isolative and argumentative." It is unclear if he intends to assert this argument as an entirely separate assignment of error. To the extent he does, the court must reject it. The ALJ's decision to impose limitations only on his interaction with the public is supported by substantial evidence. Mr. Hughes reported to Dr. Traylor in August 2018 that he tolerates people better on his medication, and in May 2018 that he feels a little less irritable on Lexapro. Ms. Bayard reported that his anxiety was more controlled at times and that he experienced more ease in social situations. Incidentally, State agency reviewing psychiatrist Dr. Gunther concluded that Mr. Hughes is able to interact appropriately with coworkers and supervisors and that he is able to interact appropriate for occasional public contact. R. at 76.

The Commissioner counters that the DOT merely lists the maximum job requirements for each occupation. She insists that not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT. Therefore, she argues there can be no conflict.

Further, the Commissioner argues that the vocational expert's testimony was based on her expertise as well as the DOT. She argues that requiring a vocational expert to mirror her testimony to the specific DOT section would undermine the purpose of obtaining the individualized determination provided by such testimony. She adds that the vocational expert was in a much better position than Mr. Hughes to determine whether her testimony was consistent with the DOT. Finally, she argues that even if the court found a conflict with regard to reaching, Mr. Hughes could still perform the surveillance system monitor job with 80,000 jobs available in the United States.  As to Mr. Hughes' argument that he could not perform any of the jobs listed by the vocational expert if he was limited to only occasional interaction with the public, the Commissioner argues that his assertion is speculative at best because the vocational expert's testimony was based on her education, knowledge, and professional experience.

   b.  *Law and Analysis*

While the DOT is relied on "for information about the requirements of work in the national economy," a vocational expert "may be able to provide more specific information about jobs or occupations than the DOT." Policy Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Information in Disability Decisions, SSR 00-4P (Dec. 4, 2000). A vocational expert's testimony "generally should be consistent with the occupational information supplied by the DOT." Id. The burden is on the adjudicator to "elicit a reasonable explanation for the conflict" when there exists "an apparent unresolved conflict between VE or VS evidence and the DOT." Id. At the hearing, it is the

adjudicator's duty to "fully develop the record" and inquire on the record "whether or not there is such consistency" in the vocational expert's testimony. Id. An affirmative responsibility rests on the adjudicator "to ask about any possible conflict between that VE or VS evidence and information provided in the DOT" when a vocational expert "provides evidence about the requirements of a job or occupation." Id. A vocational expert "may be able to provide more specific information about jobs or occupations than the DOT." Id. Ultimately, the ALJ "must resolve the conflict by determining if the explanation given by the [vocational expert] is reasonable and provides a basis for relying on the [vocational expert] testimony rather than on the DOT information." Id. The Ruling specifically requires that the ALJ "explain in the determination or decision how he or she resolved the conflict . . . irrespective of how the conflict was identified." Id.

In support of his argument, Mr. Hughes cites three cases from other circuits addressing a similar alleged "reaching" conflict with the DOT as raised here. In Moore v. Colvin, the RFC included the limitation that the claimant "could only occasionally perform overhead reaching bilaterally." 769 F.3d 987, 989 (8th Cir. 2014). The vocational expert testified that a person with the claimant's RFC could perform "janitorial work" and work "as a cafeteria attendant clearing tables." Id. The expert testified that her testimony was consistent with the DOT. However, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"), a companion to the DOT,[15] classified both jobs as requiring frequent reaching. Id. The court observed that neither the DOT nor SCO specified the direction of reaching for either type of work. Id. The court of appeals found that the ALJ had erred in relying on the vocational expert's testimony but failing to resolve this apparent conflict. Id. at 990. In so holding, the court rejected

---

[15] "In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy." SSR 00-4P.

the Commissioner's argument that the modifier "clearing tables" was enough to conclude that the job did not require more than occasional overhead reaching. Id.   The court concluded the Commissioner had failed to meet her burden of proving the claimant was not disabled at Step 5 and remanded the matter. Id.

Similarly, in Pearson v. Colvin, the RFC included a limitation that the claimant was "limited to occasional overhead lifting/reaching using the nondominant upper extremity." 810 F.3d 204, 206 (4th Cir. 2015). The vocational expert testified that a person with the RFC assigned to the claimant could perform jobs as a motel cleaner, cashier II, and machine tender/bench press operator. Id.   The vocational expert did not mention any conflicts between his testimony and the DOT, and the claimant's counsel did not ask the expert any questions. Id.   Yet the DOT and SCO listed a "frequent" reaching requirement for all three of the listed positions. Id.  at 210. The court concluded that this created an apparent conflict[16] because although the DOT did not expressly state

---

[16] The court concluded that "apparent" as used in SSR 00-4P to refer to conflict does not mean "obvious" but instead means "seeming real or true, but not necessarily so." 810 F. 3d at 209. The court noted that:

> the context of the word "apparent" in SSR 00–4p makes plain that the Ruling intends the latter meaning—that the ALJ must identify where the expert's testimony seems to, but does not necessarily, conflict with the Dictionary. For the Ruling explains that "[i]f the [vocational expert]'s ... evidence appears to conflict with the [Dictionary], the adjudicator will obtain a reasonable explanation for the apparent conflict." SSR 00–4p, at *4 (emphasis added). And the title of one of the Ruling's sections addresses "Conflicts (or Apparent Conflicts)," id. at *2; that title would be redundant if "apparent" meant "obvious."

Pearson, 810 F.3d at 209 (citations and alterations in original). Some district courts in this circuit have adopted the Pearson definition of apparent conflict. E.g., Everhart v. Comm'r of Soc. Sec., No. 3:17-CV-188-DAS, 2018 WL 3614196, at *3 (N.D. Miss. July 27, 2018); Olive v. Colvin, No. CV 16-559, 2017 WL 1653303, at *6 n.1 (E.D. La. Mar. 31, 2017), report and recommendation adopted, No. CV 16-559, 2017 WL 1592488 (E.D. La. Apr. 28, 2017). But at least one has rejected it with reference to the Fifth Circuit's decision in Carey v. Apfel. Hardy v. Berryhill, No. 6-18-CV-00363-ADA, 2020 WL 5793431, at *5 (W.D. Tex. Sept. 29, 2020). The court of appeals in Carey found at best a "tangential" conflict where the vocational expert testified that the claimant could perform certain work with one arm and the DOT description of the cited jobs required fingering and handling. 230 F.3d 131, 146 (5th Cir. 2000). The Fifth Circuit explained that the DOT did not require "*bilateral* fingering ability or dexterity and the vocational expert specifically testified that the jobs of cashier and ticket seller could be performed with the use of only one arm." Id. (emphasis added).  The court found that the DOT was thus silent on whether the job could be performed with the use of only one arm. Id. The ALJ relied on the testimony of the vocational expert to conclude that the claimant could perform the cited work, and the Fifth Circuit made clear that this was entirely proper under the circumstances. Id. at 146-47. Notably, the Carey decision was rendered on October 5, 2000, two months before SSR 00-4P, which provides the requirement that the ALJ resolve "apparent conflicts," was issued by the SSA on December 4, 2000.

that frequentl bilateral overhead reaching was required, the broad definition of reaching could include such reaching. Id.  at 211. The court observed "[a]lthough we could guess what these occupations require in reality, it is the purview of the ALJ to elicit an explanation from the expert as to whether the occupations do, in fact, require frequent bilateral overhead reaching." Id.  The court of appeals remanded, noting that this did not mean the ALJ must find the claimant is unable to perform the listed jobs, but merely that the ALJ and the expert "should address exactly what form of reaching the stated occupations require and whether the claimant can fulfill those requirements." Id.  Then the vocational expert must testify how many of the positions do not require frequent bilateral overhead lifting and if a sufficient number of such positions exist in the national economy, the ALJ could properly find the claimant not disabled. Id.

The Second Circuit Court of Appeals in Lockwood v. Commissioner of Social Security Administration remanded under similar circumstances. 914 F.3d 87, 94 (2nd Cir. 2019). In Lockwood, the claimant's RFC required that he "avoid all overheard reaching tasks" and the vocational expert testified that someone with the claimant's RFC could perform three jobs classified by the DOT as requiring occasional or frequent "reaching." Id.  at 92. Because "reaching" was defined as extending the arms and hands in "any direction," the court of appeals found this created at least an apparent conflict that required the ALJ to obtain a reasonable explanation. Id. Because the ALJ failed to do so and reconcile the conflict, the court held that the vocational expert's testimony could not represent substantial evidence that the clamant could successfully perform work in the national economy. Id. at 94. The court reversed and remanded. Id.

The Commissioner does not address Moore, Pearson, or Lockwood.

Here, Mr. Hughes argues that the DOT descriptions for the jobs listed by the vocational expert are inconsistent with a limitation to occasional overhead reaching and a limitation to occasional interaction with the public. The DOT job descriptions for each of the listed occupations is as follows:

**209.567-014 Order Clerk, Food and Beverage (hotel & rest.):** [17]
Takes food and beverage orders over telephone or intercom system and records order on ticket: Records order and time received on ticket to ensure prompt service, using time-stamping device. Suggests menu items, and substitutions for items not available, and answers questions regarding food or service. Distributes order tickets or calls out order to kitchen employees. May collect charge vouchers and cash for service and keep record of transactions. May be designated according to type of order handled as Telephone-Order Clerk, Drive-In (hotel & rest.); Telephone-Order Clerk, Room Service (hotel & rest.).

**237.367-046 Telephone Quotation Clerk (financial) alternate titles: information clerk, brokerage; quote clerk; telephone-information clerk**
Answers telephone calls from customers requesting current stock quotations and provides information posted on electronic quote board. Relays calls to REGISTERED REPRESENTATIVE (financial) 250.257-018 as requested by customer. May call customers to inform them of stock quotations.

**379.367-010, Surveillance System Monitor:**
Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

1 U.S. Dep't of Labor, Dictionary of Occupational Titles 180, 207, 281 (4th ed. rev. 1991).

Although he does not say so specifically, Mr. Hughes also appears to rely on the SCO. That publication classifies the jobs 209.567-014 Order Clerk, Food and Beverage and 237.367-046 Telephone Quotation Clerk as requiring frequent reaching. U.S. Dep't of Labor, Selected

---

[17]  The vocational expert described this job code as General Clerk.

Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles 335-36 (1993). "Reaching" is defined as "[e]xtending hand(s) and arm(s) in any direction." Id. at C-3. "Frequent" means the activity exists from 1/3 to 2/3 of the time. Id. at ID-2. The SCO classifies the job 379.367-010, Surveillance System Monitor as not requiring reaching. Id. at 46.

The Commissioner argues that there is no problem here because the DOT lists the maximum requirement for the occupations and that just because the DOT shows a job requires frequent reaching, that does not mean that a person limited to only occasional overhead reaching could not perform it. The Commissioner insists that vocational expert's testimony can be accepted without further question because it was based on her expertise.

While the court agrees that a person limited to occasional overhead reaching may very well be able to perform a job as an "Order Clerk, Food and Beverage" or "Telephone Quotation Clerk," we simply cannot assume that this is so where there is no testimony to support the conclusion. The present case is almost identical to the cases considered by the courts of appeals in Moore, Pearson, and Lockwood. And like those courts, the court here finds that there is an apparent conflict. Mr. Hughes was limited to only occasional overhead reaching. Two of the three jobs identified by the vocational expert require frequent reaching in any direction. This is an apparent conflict, and the ALJ should have solicited testimony from the vocational expert regarding whether the frequent reaching included frequent overhead reaching and, if so, whether some subset of the listed jobs required only occasional reaching.[18] While the court might guess at the answers to these questions, it is the ALJ's duty to resolve the conflict. In failing to do so, the ALJ erred.

---

[18] For example, in Michael H. v. Kijakazi, the court observed "[u]nlike in Pearson, the ALJ here identified the conflict and explained how the conflict was addressed." No. CV ADC-21-725, 2022 WL 170644, at *4 (D. Md. Jan. 18, 2022). "The VE testified at the hearing, based on her experience and training, to the impact of Plaintiff's reaching limitations on the number of jobs that exist in the national economy and those job numbers were reduced to accommodate her reaching limitations." Id.

The ALJ also found that Mr. Hughes' RFC required a limitation to "occasional public interaction." Mr. Hughes argues that all of the listed jobs require interaction with the public. Indeed, the job 209.567-014 Order Clerk, Food and Beverage involves taking food and beverage orders and suggesting menu items; the job 237.367-046 Telephone Quotation Clerk requires answering telephone calls from customers; and the job 379.367-010, Surveillance System Monitor requires notifying authorities by telephone of the need for corrective action when monitoring a premises using closed circulation television monitors. The DOT and SCO do not designate the frequency with which any public interaction listed in the description would occur. The description indicates that as to the Order Clerk and Telephone Quotation clerk, public interaction is an essential component of the job responsibilities. One must take food and beverage orders from customers and suggest menu items and substitutions, and the other must answer telephone calls from customers and provide them with information. As a result, there is an apparent conflict between Mr. Hughes' limitation to occasional public interaction and the performance of these jobs. While it may be possible to perform these, or some subset of these, jobs while being limited to occasional public interaction, the ALJ should have questioned the vocational expert to determine whether this was so.

As to the Surveillance System Monitor job, however, the description indicates that only minimal public interaction is required. The main duties are monitoring premises to detect crimes or disturbances using closed circuit television monitors. Only in the case of a developing incident does the job require the person to telephone the police or other agency to notify them of the location of the disruptive activity. The court finds no apparent conflict.

Despite the ALJ's error in failing to resolve the apparent conflict between the frequent reaching requirement and the public interaction requirement as to two of the three jobs listed by

36

the vocational expert, there is no unresolved conflict as to the 379.367-010, Surveillance System Monitor job. The vocational expert testified that there were 80,000 such jobs available in the national economy. This is sufficient to sustain the conclusion that there exist a significant number of jobs in the national economy that Mr. Hughes can perform. See Lirley v. Barnhart, 124 F. App'x 283, 283–84 (5th Cir. 2005) (holding that "[i]n light of the vocational expert's testimony that [claimant] could perform the job of surveillance system monitor and that 50,000 such jobs exist in the national economy, substantial evidence supports the Commissioner's finding that [claimant] is not entitled to Social Security disability benefits.").

**Issue No. 3**     ***Whether the appointment of Andrew Saul as a single commissioner of the SSA removable only for cause and for a longer term than the president violates separation of powers and therefore results in a constitutionally defective decision by the ALJ and Appeals Council judges requiring a remand.***

　　　*a.  Parties' Arguments*

Mr. Hughes argues that Andrew Saul was unconstitutionally appointed as Commissioner of the SSA because pursuant to the Act, the Commissioner is the singular head of an agency that serves for six years and cannot be removed by the president except for cause. He argues that the ALJ and Appeals Council who decided his case were delegated the authority to issue a final decision as to benefits eligibility from Mr. Saul and that the ALJ and Appeals Council decided the case under regulations promulgated by Mr. Saul. Mr. Hughes argues that because Mr. Saul had no constitutional authority to delegate authority or to issue regulations, that a presumptively inaccurate legal standard was utilized to adjudicate this disability claim at the administrative level.

The Commissioner opposes. Although she agrees that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause, she argues that this alone does not support setting aside an unfavorable SSA decision because Mr. Hughes must first demonstrate that the restriction actually

caused him harm. The Commissioner argues that Mr. Hughes cannot do so. First, she points out that Mr. Saul did not appoint the ALJ that decided Mr. Hughes' case. Instead, the ALJ was appointed by then Acting Commissioner Berryhill. Because Berryhill was an acting commissioner who could be removed by the President at any time, the Commissioner argues that there is no separation of powers issue as to the ALJ. Additionally, to the extent Mr. Hughes argues that the ALJ who adjudicated his claim served under authority delegated from a Commissioner that enjoyed unconstitutional removal protection, the Commissioner argues that he is incorrect because Mr. Saul was not appointed until June 2019, after the ALJ issued the decision in his case on March 26, 2019. Further, the Commissioner argues that Mr. Hughes cannot conceivably show how the President's supposed inability to remove the Commissioner without cause might possibly have affected any ALJ's disability benefits decision, much less the decision on Mr. Hughes' specific claim. Moreover, the Commissioner argues that Mr. Hughes' request for a rehearing should be denied under the harmless error doctrine, the de facto officer doctrine, the rule of necessity, and broad prudential considerations.

    *b.  Law and Analysis*

The parties here agree that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause. The court therefore assumes, for purposes of this decision, that the removal provision as to the Commissioner is unconstitutional. [19]

---

[19] See Seila L. LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183, 2204 (2020) (holding the structure of the Consumer Financial Protection Bureau unconstitutional where its director was insulated from removal by an accountable President because the statute only allowed removal for cause, where the CFPB was led by a single director who served a five-year term—longer than the term of a President such that some presidents might not even be able to appoint the director, and where the CFPB received funds outside of the appropriation's process such that the President could not recommend or veto as with a spending bill). Under the Act, the Commissioner of the SSA is a singular head of an agency that serves for a six year term and can only be removed by the President upon a viding of neglect of duty or malfeasance in office. 42 U.S.C. §902(a)(3).

An unconstitutional removal provision does not automatically void every action of the agency. See Collins v. Yellen, 141 S. Ct. 1761, 1789 (2021). To undo the agency action, the plaintiff must show that the unconstitutional provision inflicted compensable harm.[20] Id. In Collins, the Supreme Court provided some examples that would clearly meet this standard:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause for removal." Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way.

Id. In the case before the Court in Collins, the plaintiffs seeking to undo certain agency action argued that the unconstitutional removal provision applicable to the Director of the Federal Housing Finance Agency ("FHFA") had caused harm because in the absence of the provision, the President might have removed one of the Directors who implemented the challenged agency action or the Directors might have altered their behavior in a way that could have benefited the plaintiffs. Id. [21] The Court described the question of whether the unconstitutional provision had caused harm "less clear-cut" and held that the lower courts should resolve the parties' arguments in the first instance. Id.

---

[20] The plaintiffs in Collins challenged the third amendment to an agreement that the Federal Housing Finance Authority had entered into as conservator for the companies in which plaintiffs were shareholders. 141 S. Ct. at 1770. The Court held that because the third amendment was adopted by an Acting Director who was removable at will, it was not void *ab initio*. Id. at 1787. As to plaintiffs' argument that a Director subject to the unconstitutional removal provision had "implemented" the third amendment, the court explained that although the Director of the Federal Housing Finance Agency was unconstitutionally protected from removal, each confirmed Director during the relevant period had been properly appointed. Thus, the Court concluded, "there is no reason to regard any of the actions taken by the FHFA in relation to the [challenged action] as void." Id. The court then proceeded to explain that "it is still possible for an unconstitutional provision to inflict compensable harm." Id.

[21] It does not appear that the government argued that there was no harm because plaintiff's "might have" arguments were speculative and unsupported by evidence. The court noted that the government argued that regardless of the President's power to remove the Director, he retained the power to supervise the adoption of the agency action at issue because the counterparty to the action was the Department of Treasury led by a Secretary who was subject to removal at will. 141 S. Ct. at 1789.

Courts applying the <u>Collins</u> standard to the Commissioner of the SSA in the context of an appeal of a denial for Social Security benefits have found no harm that can be linked to the unconstitutional removal provision.[22] These courts have required the claimant to show some connection between the unconstitutional removal clause and the decision denying benefits.[23] Merely invoking "changes in the Hearings, Appeals and Litigation Law Manual and the way musculoskeletal impairments are evaluated" has been found insufficient to demonstrate a connection between the removal provision and the adverse disability benefit decision where plaintiff has not shown "how those changes made it more or less likely that her applications would be denied." <u>Rhouma v. Comm'r of Soc. Sec.</u>, No. 4:20-CV-2823, 2021 WL 5882671, at *11 (N.D. Ohio Dec. 13, 2021).[24]    Some courts considered that the ALJ's decision was based on an

---

[22] <u>E.g.</u>, <u>Dondia M. L. v. Kijakazi</u>, No. 2:20-CV-06497-AFM, 2022 WL 60591, at *3 (C.D. Cal. Jan. 5, 2022) ("Plaintiff identifies no particular harm suffered by virtue of her claim being adjudicated during Commissioner Saul's tenure by an ALJ who was otherwise properly appointed. She has failed to show any connection between the unconstitutional removal clause and ALJ Gunn's decision denying her benefits. Further, nothing in the record supports the conclusion that the disability decision in Plaintiff's case is in anyway traceable to Commissioner Saul."); <u>Crossley v. Kijakazi</u>, No. 3:20-CV-02298, 2021 WL 6197783, at *7 (M.D. Pa. Dec. 31, 2021) ("Crossley cannot show how the President's supposed inability to remove the Commissioner without cause might have affected any ALJ's disability benefits decision, much less the decision on his specific claim."); <u>Carolyn M. D. v. Kijakazi</u>, No. 2:20-CV-06725-AFM, 2021 WL 6135322, at *12 (C.D. Cal. Dec. 28, 2021) ("Plaintiff has failed to show any connection between the unconstitutional removal clause and ALJ Carberry's decision denying her benefits. She identifies no particular harm suffered by virtue of her claim being adjudicated during Commissioner Saul's tenure by an ALJ who was otherwise properly appointed. Further, nothing in the record supports the conclusion that the disability decision in Plaintiff's case is in anyway traceable to Commissioner Saul. Accordingly, Plaintiff cannot rely upon the unconstitutional removal clause as a basis for obtaining a new hearing."); <u>Tibbetts v. Comm'r of Soc. Sec.</u>, No. 2:20-CV-872-SPC-MRM, 2021 WL 6297530, at *6 (M.D. Fla. Dec. 21, 2021), <u>report and recommendation adopted</u>, No. 2:20-CV-872-SPC-MRM, 2022 WL 61217 (M.D. Fla. Jan. 6, 2022) ("The Undersigned has not found any evidence suggesting that there is a connection between the removal provision and any possible harm to Plaintiff.");

[23] <u>See</u> footnote 20, <u>supra</u>.

[24] <u>See</u> <u>Lisa Y. v. Comm'r of Soc. Sec.</u>, No. C21-5207-BAT, 2021 WL 5177363, at *7 (W.D. Wash. Nov. 8, 2021) ("[T]here is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner. Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims. Plaintiff thus fails to show how or why § 902(a)(3) removal clause possibly harmed her."); <u>Nudelman v. Comm'r of Soc. Sec. Admin.</u>, No. CV-20-08301-PCT-MTL, 2022 WL 101213, at *13 (D. Ariz. Jan. 11, 2022) ("Beyond arguing a constitutional taint flowing from § 902(a)(3), Nudelman fails to point out which, if any, defective regulations were promulgated in this case, how they applied to his claim, and how they affected the outcome such that he suffered a compensable harm.);

uncontested factual record and the application of established law.[25] Courts have refused plaintiff's request for a remand where the ALJ who denied the claim was appointed by an acting Commissioner not subject to the removal restriction.[26]

Mr. Hughes makes no attempt to demonstrate a connection between the removal provision and the adverse disability decision. He argues that the ALJ's delegation of authority came from Mr. Saul and is therefore constitutionally defective. As noted by the Commissioner, however, the ALJ who decided his case was appointed by an acting Commissioner not subject to a removal provision and the ALJ's opinion was issued before former Commissioner Saul was appointed. There was, therefore, no constitutional defect in play at the time the ALJ decided Mr. Hughes' case. Moreover, the existence of an unconstitutional removal provision as to the head of an agency does not render the official impotent as would be the case with an unconstitutional appointment.[27] To obtain relief, Mr. Hughes cannot rely on the removal provision alone:  he must show that the removal provision harmed him.[28] The fact that an ALJ or the Appeals Council received their authority from the Commissioner is not enough.

---

[25] Perez-Kocher, v. Comm'r of Soc. Sec., No. 6:20-CV-2357-GKS-EJK, 2021 WL 6334838, at *5 (M.D. Fla. Nov. 23, 2021), report and recommendation adopted, No. 6:20-CV-2357-GKS-EJK, 2022 WL 88160 (M.D. Fla. Jan. 7, 2022) ("Plaintiff has alleged no direct action by former Commissioner Saul himself, and no involvement—or even awareness—by the former President in the ALJ's decision. . . . . Plaintiff has made no clear allegation that Acting Commissioner Saul's unconstitutional tenure resulted in compensable harm to him. The ALJ's decision here was based upon an uncontested factual record and the application of established law, including case law, which generally cannot be changed by the Commissioner."); see Nudelman, 2022 WL 101213, at *13 ("The ALJ's opinion was well-reasoned, contained no harmful legal error, considered the entire record, and was supported by the record.")

[26] Crossley, 2021 WL 6197783, at *6; see Campbell v. Comm'r of Soc. Sec. Admin., No. CV-20-02048-PHX-JAT, 2022 WL 34677, at *4 (D. Ariz. Jan. 4, 2022) ("Plaintiff does not allege that the ALJ presiding over Plaintiff's case was appointed during Saul's tenure or otherwise received her authority to adjudicate social security claims directly from him. Moreover, Plaintiff does not specify which social security rules, if any, were promulgated by Saul during his tenure and applied in Plaintiff's case. Therefore, the Court finds that Plaintiff has not stated a compensable harm tied to Saul's actions or his unconstitutional removal protections that would warrant a new hearing in this case."); Standifird v. Kijakazi, No. 20CV1630-GPC(BLM), 2021 WL 5634177, at *4 (S.D. Cal. Dec. 1, 2021) ("Because an Acting Commissioner does not have the same removal restriction as the Commissioner and because ALJ Schum was properly appointed, Plaintiff's argument is not persuasive in this case.").

[27] The Supreme Court in Collins made clear that an unconstitutional removal provision is not the same as an unconstitutional appointment provision and held that the unconstitutional removal provision did not render actions taken by the FHFA void. 141 S. Ct. at 1787.

[28] See id. at 1788-89.

Mr. Hughes further argues that this case must be remanded because the ALJ and Appeals Council decided this case under regulations promulgated by Mr. Saul who had no authority to issue those rules. Of course this cannot be true as to the ALJ who decided the case before Mr. Saul was appointed. But even as to the Appeals Council, Mr. Hughes fails to identify any applicable regulation issued by Mr. Saul. Had he done so, he would have to show not only how that regulation harmed him but also how the removal provision influenced Mr. Saul's issuance or implementation of it. Like the court in <u>Rhouma</u>, the court here finds that a vague reference to regulations issued by a commissioner subject to an unconstitutional removal provision is not enough to require remand. <u>See</u> 2021 WL 5882671, at *11.

Having found that Mr. Hughes has not established a connection between the unconstitutional provision and the adverse disability decision, the court finds that remand is not appropriate on the basis of the removal provision. It is not necessary to address the Commissioner's alternative arguments in opposition to this assignment of error.

## **RECOMMENDATION**

Having found only harmless error in the ALJ's consideration of the medical opinions and the ALJ's resolution of conflicts between the DOT and the vocational expert testimony and having further found that Mr. Hughes has not established any connection between the denial of benefits and the purportedly unconstitutional provision regarding removal of the Commissioner, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 20) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 21) be GRANTED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 8th day of March, 2022.

Janis van Meerveld
United States Magistrate Judge